## BILL HOGSHOOTER v. STATE.

No. A-7422.  Opinion Filed Feb. 28, 1931.
(296 Pac. 531.)

C. S. Fenwick, for plaintiff in error.

J. Berry King, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Delaware county of manslaughter in the first degree, and his punishment fixed at 20 years in the penitentiary.

The record discloses that defendant was a son-in-law of Dan Thurman, a resident of the village of Oakes. On the day before the homicide, defendant's wife, because of some trouble between her and defendant, had left her home and gone to her father's. Late in the afternoon, defendant came to Thurman's house with a rifle and found his wife and the family at supper, except Thurman, who had gone to a store nearby. Defendant ordered his wife to go home, and punched her with the gun, and they had a scuffle over it. Nellie Thurman, a girl of 17, ran to where the father was and told him, in substance, that defendant was at the house and was going to kill Mabel. Thurman went to the house, looked in, and at once ran back to the store and asked for his pistol, which he had left there some time before, and said he was going "to kill the son-of-a-bitch." Defendant, hearing that Thurman had gone for his gun, went to the front door with his rifle in his hand, and, as Thurman was returning pistol in hand, defendant fired one shot, from the effect of which Thurman died almost immediately. There is a sharp conflict in the testimony as to the position of the parties when the shot was fired. Defendant testified that at the time he fired Thurman was pointing the pistol at him and he thought he was going to kill him. The two younger daughters of deceased testified, in substance, that, at the time defendant shot their father, the father had a pistol in his hand and was moving sidewise with his arm up. Some of this evidence is by demonstration before the jury, and we are not able to know just what the demonstration was. Dr. Prowell, a physician called immediately after

the homicide, is not much more definite. He testified in part:

"Q. Did you make an examination of the body of Dan Thurman? A. Yes.

"Q. Tell the jury what you found? A. It was a very peculiar wound. It was a small gunshot wound in the right arm about five inches below the point of the right shoulder on the back of the arm.

"Q. Step down here, Doctor, and show on my body whereabouts in that arm. A. Right arm, about there was the bullet wound.

"Q. What course did it take? A. Followed up the arm and into the lung. * * *

"Q. I believe you said the point of entrance was on the outside of the right arm? A. Yes.

"Q. How far from the point of the shoulder? A. About five inches.

"Q. That bullet ranged down the arm? A. Ranged up the arm.

"Q. And into the lung? A. Yes.

"Q. Into the right lung? A. Yes. * * *

"Q. If that bullet entered the outside of his arm about five inches from this point, passed up the arm and went into the top of the lung, what would that indicate as to the position of the arm at the time of entering? A. It was raised on a level of the shoulder.

"Q. About like this (indicating). A. Yes."

Redirect examination:

"By Mr. Hampton: Q. You say the elbow was raised when the entrance was made by the bullet. You couldn't tell which way the forearm was raised? A. No, sir; don't know anything about the forearm. The elbow was raised to the level of the shoulder. * * *"

Upon an examination of the entire record, there appears sufficient evidence to sustain the judgment, but from the entire case we are of the opinion that justice requires the judgment be modified by reducing the punishment to a term of 10 years in the penitentiary, and, as modified, the case is affirmed.

DAVENPORT, P. J., and CHAPPELL, J., concur.